GABRIEL GUTIERREZ AND CONNIE GUTIERREZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Gutierrez v. Commissioner
Docket No. 648-93
United States Tax Court
T.C. Memo 1995-252; 1995 Tax Ct. Memo LEXIS 254; 69 T.C.M. (CCH) 2843; June 12, 1995, Filed *254 Decision will be entered under Rule 155. Gabriel Gutierrez, pro se. For respondent: Derek B. Matta. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Year
Deficiency
1985
$ 3,250
1986
50,077
1987
29,053
1988
30,083
Additions to Tax
Year
Sec.
Secs.
Secs.
Secs.
6653(a)(1)
6653(a)(2)
6653(b)(2)
6651(a)(1)
6653(a)(1)(A)
6653(a)(1)(8)
6653(b)(1)(A)
1985
--   $ 163
*
--  1986
--   694
*
$ 27,096
1987
($ 2,592)
9
*
41,235
1988
--   78
--
21,395
Additions to Tax
Secs.
Sec.
6653(b)(2)
Year
6653(b)(1)(B)
6661
1985
-- -- 1986
** $ 12,519
1987
** 7,263
1988
--
7,521
Respondent conceded *255 at trial that Mrs. Gutierrez is not liable for the additions to tax for fraud under section 6653(b)[1] for 1986, 1987, or 1988. Respondent also concedes that Mr. Gutierrez is not liable for fraud for 1988. The parties have agreed that the correct deficiencies are as follows: 1985-$ 3,250; 1986-$ 38,268; 1987-$ 17,071; 1988-$ 7,345. The issues remaining in dispute are whether Mr. Gutierrez (hereinafter petitioner) is liable for the additions to tax for fraud for 1986 and 1987, and whether petitioners are liable for additions to tax for negligence for tax years 1985 through 1988, and additions for substantial understatement for tax years 1986 through 1988. FINDINGS OF FACT Many of the facts have been stipulated. The stipulation of facts and attached exhibits are incorporated herein by this reference. When they filed *256 their petition in this case, petitioners resided in Austin, Texas. They filed joint Federal income tax returns for tax years 1985 through 1988. Petitioner received a B.B.A. (bachelor of business administration) degree from the University of Texas. His course of study included basic and intermediate accounting. He received a J.D. degree from the University of Texas and has been practicing law in Austin, Texas, since 1967. During 1985 through 1988, petitioners had income and expenses from petitioner's law practice and from several pieces of jointly owned rental property. Petitioner used the cash method of accounting to record income and expenses from his law practice. Armando Ruiz (Mr. Ruiz) kept the books of petitioner's law practice for the years in issue and prepared petitioners' tax returns for 1986 and 1987. He was also petitioner's brother-in-law. Mr. Ruiz has a bachelor of business administration degree and provides bookkeeping and tax preparation services to the public. Mr. Ruiz prepared petitioner's monthly income statements, profit and loss statements, and balance sheets, and he reconciled the operating account's bank statements. Mr. Ruiz took over the system previously *257 established by the prior bookkeeper, Ruben Ruiz (no relation), and adopted the same method of record keeping. At yearend, Mr. Ruiz used his cumulative computations to prepare the Schedule C gross income portions of the return. During the years in issue, petitioner did not have a personal bank account. He used two bank accounts for his law practice: a business account, for operating expenses, and an escrow account (which later became a trust account). Petitioner used the business account to deposit payments from clients by cash or check, transfer fee income from the trust account, and pay business expenses. In addition, petitioner occasionally used the business account to pay rental and personal expenses. The escrow account was used to maintain escrows, to deposit proceeds from lawsuits, and to pay expenses of a case and the client's portion of a settlement. Petitioner also used the account to deposit Social Security checks from his mother and to pay car and mortgage payments for her. In 1987, petitioner began to also deposit rents into the escrow account and to make mortgage payments on his rental property from it. Under the procedure established by a prior bookkeeper, amounts *258 that represented petitioner's fees for cases (after expenses and the client's portion of a judgment or settlement were paid out) were transferred from the escrow account to the business account to be included in the gross receipts of the law practice. During 1986 and 1987, petitioner provided Mr. Ruiz with bank statements, deposit slips, and canceled checks from the business account, from which to prepare and maintain the books and records for the law practice. He also gave Mr. Ruiz access to all office records and answered his questions. Although they were available, Mr. Ruiz did not request any other records. After respondent's audit began, petitioner gave Mr. Ruiz the cash receipt and retainer books discussed below, in order to reconcile deposits to the operating account. Mr. Ruiz determined the amount of expenses incurred by the law practice by examining canceled checks from the business account. Petitioner usually designated which checks were for personal expenses. Mr. Ruiz kept a chart of accounts that represented law firm expenses. If Mr. Ruiz was unsure whether a check was personal or business, petitioner instructed him to treat it as "owner's draw". Mr. Ruiz prepared *259 the Schedules C for 1986 and 1987 generally reporting as gross receipts only the deposits (including transfers) to the business account without consideration of activity in the escrow/trust account. One exception, however, was a check in the amount of $ 43,212.31 issued for a personal real estate transaction from the trust account in 1986. Petitioner identified this amount to Mr. Ruiz as additional law firm income, and it was reflected in the total gross receipts reported on petitioner's Schedule C. A second exception was $ 30,000 additional rental income deposited in the escrow account, which petitioner verbally called to Mr. Ruiz' attention, and which was reported on Schedule E of petitioners' return. In 1986 and 1987, petitioner's secretary, Yolanda Perkins, was primarily responsible for collecting payments from the clients. She maintained a cash receipts book at her desk, and, when she received payment on an account, she gave the client a receipt. She would attach the cash or checks to the receipt book with a paper clip, where they stayed until petitioner picked them up. She did not prepare daily totals or deposit slips, but she made an entry to a client's accounts receivable *260 ledger card whenever a payment was received. From time to time petitioner personally received lump-sum payments (as a retainer, for example, in a divorce case), and he maintained a "retainer" book in his desk in order to issue clients receipts for payments made directly to him. The cash receipts book and the retainer book were identical except for the preprinted receipt numbers. Petitioner periodically collected the cash and checks, put them in his billfold, and deposited them in the bank. [2] However, he did not deposit all of the cash receipts from the law practice during the years in issue. Petitioner did not specifically disclose to Mr. Ruiz that he regularly kept back some cash each week. Petitioner used these funds for a combination of personal expenses, law firm expenses, and rental expenses, but he did not maintain receipts or records of how the money was spent. In 1986 and 1987, petitioner issued checks totaling $ 71,820.70 and $ 44,183.75, respectively, *261 from the trust account for expenditures unrelated to his law practice. These checks generally fell into three categories. [3] Some were payments on behalf of petitioner's mother, made with her own funds deposited into the escrow account; the parties agree these amounts are not income to petitioner. A second category consisted of payments of deductible rental expenses made with rental income deposited into the account. The rent deposits were almost all reported by petitioner as rental income, and expenses paid by checks from the escrow account were generally claimed on petitioners' return. The parties have now stipulated the correct amounts of rental income and expenses. The checks in the third group were clearly for petitioner's personal expenses (such as groceries). Petitioner failed to include these latter amounts as income on joint Federal income tax *262 returns for tax years 1986 and 1987, since the funds were not transferred to the business account, and Mr. Ruiz did not examine the escrow account. In spite of many stipulations, however, the record does not reflect the final dollar amounts of any of these categories, so we are unable to determine the amount of the third category, which would be, generally speaking, the amount of unreported income. [4]
Petitioner is a recovering alcoholic. His drinking began as a teenage soldier, and steadily grew worse. It became more intense after his father's death August 29, 1986. In 1987, he began having dizzy spells and blackouts and discovered he had liver damage and diabetes. He suffered memory losses. The drinking interfered with petitioner's conduct of his law practice and rental business. Petitioner was reprimanded *263 by State and Federal judges for missing court appointments, and he lost clients during 1986 and 1987 because of his drinking. Both Mr. Ruiz and Ms. Perkins, who has been his secretary for more than 10 years, observed his alcohol problems especially during 1986 and 1987. Ms. Perkins noticed the odor of alcohol when petitioner came to work in the morning. She often had to telephone him at home to wake him up and remind him of court appointments. Judges would have their secretaries telephone Ms. Perkins to ask her to remind petitioner to be in court. Once a client was kept locked in the courtroom until petitioner appeared in the afternoon. However, despite petitioner's drinking, he was able to continue his law practice. He was never subjected to any disciplinary action by the State bar. Petitioner stopped drinking on March 10, 1987, but his physical condition did not immediately improve. He continued to have episodes of sweating and pain in his liver throughout the year. Petitioner did not keep his office or desk locked, and he did not attempt to conceal anything from Ms. Perkins or Mr. Ruiz. He never asked either of them to lie to or conceal anything from respondent's agent. *264 He answered all of Mr. Ruiz' questions concerning his records. Income from the law practice was determined by Mr. Ruiz during 1986 and 1987 using the deposits to the operating account. Mr. Ruiz reconciled the business account monthly but did not go over it with petitioner. No cash disbursement journal was maintained. Mr. Ruiz did not attempt to reconcile the cash receipts books. At the end of the year petitioner calculated his rental income and expenses primarily by memory. He referred to eviction notices to determine which properties were vacant and for how long. Petitioner multiplied the months of occupancy by the amount of rent charged. This information was then furnished to Mr. Ruiz to incorporate into the returns. No rental ledger was maintained, nor were the rents actually deposited to the escrow account traced. Mr. Ruiz was not a Certified Public Accountant (C.P.A.), had not prepared tax returns for attorneys, and was unfamiliar with trust accounts. He was aware of the escrow account and the receipt books, but he did not think he needed to look at them. Respondent began to examine petitioners' 1986 tax year in February 1989. As requested, petitioner provided the *265 revenue agent with all bank statements, copies of canceled checks and deposit slips for the business account, and copies of the accounting records prepared by Mr. Ruiz. When the agent requested cash receipt books, petitioner initially provided the cash receipt book kept by his secretary. When the agent found a $ 19,000 discrepancy, he asked if there were other receipt books. The following day petitioner provided the retainer book maintained at his own desk. Petitioner also provided all records concerning the escrow/trust account. Petitioner provided all information requested by the agent and answered the agent's questions to the best of his ability. During the audit, petitioner did not conceal any income from respondent and fully cooperated. He did not falsify any records. He freely stated he used the operating account for both personal and business expenses, and that he held back some cash from the business, although he was unsure how much because he had not kept a record of it. Part of the withheld cash was used for office supplies and related business expenses. It became apparent, during the course of the audit, that the 1986 and 1987 Federal income tax returns had not *266 correctly reported all income and expenses. Petitioner then retained a well-known local C.P.A., Gustavo Garcia, to correct all deficiencies in petitioner's accounting system and prepare petitioners' 1988 return. Although petitioner furnished all information to Mr. Garcia and accountants in his firm with the intention to correct his tax accounting, the 1988 Federal income tax return they prepared contained major errors. As a result, respondent determined a large adjustment and an addition for civil fraud. Respondent has now stipulated that the C.P.A. erred by failing to include law suit settlements deposited in the operating accounts, even though these settlements were reflected in petitioner's books. Recognizing that the error was that of the C.P.A. and not petitioner, respondent conceded the fraud penalty for 1988. Respondent has also conceded that many of the items originally determined by the revenue agent as personal expenditures were actually deductible rental expenditures. Prior to trial, respondent's appeals office conceded approximately $ 102,000 of the revenue agent's adjustments, as well as the fraud penalty for 1988. The reduction resulted in a total decrease in *267 the deficiencies asserted for 1986 through 1988 from $ 109,213 to $ 62,684. OPINION Fraud
Respondent must prove by clear and convincing evidence the two elements of fraud: (1) The existence of an underpayment of tax each year, and (2) that some part of the underpayment is due to fraud. Hebrank v. Commissioner, 81 T.C. 640, 642 (1983); Mosteller v. Commissioner, T.C. Memo. 1986-505, affd. without published opinion 841 F.2d 1123 (4th Cir. 1988). Fraud is actual, intentional wrongdoing, and the intent is the specific purpose to evade a tax believed to be owing. Webb v. Commissioner, 394 F.2d 366, 377 (5th Cir. 1968), affg. T.C. Memo. 1966-81. Respondent must show that petitioner intended to evade taxes by conduct calculated to conceal, mislead, or otherwise prevent the collection of the tax. Stoltzfus v. United States, 398 F.2d 1002, 1004 (3d Cir. 1968); Webb v. Commissioner, supra at 377. Fraud is never to be presumed. Toussaint v. Commissioner, 743 F.2d 309, 312 (5th Cir. 1984), *268 affg. T.C. Memo. 1984-25; Webb v. Commissioner, supra at 377. The existence of fraud is a question of fact to be determined on the basis of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Respondent has proved (and petitioner admits) the existence of an underpayment of tax for 1986 and 1987. Although a mere understatement of income does not constitute proof of fraud, a pattern of consistent and substantial understatement of income is by itself strong evidence of fraud. Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. T.C. Memo. 1985-63; Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172. Courts frequently list various factors or "badges of fraud" from which fraudulent intent may be inferred. Recklitis v. Commissioner, 91 T.C. 874, 909 (1988). Although such lists are nonexclusive, *269 some of the factors this Court has considered as indicative of fraud are (1) understatement of income, (2) inadequate records, (3) failure to file tax returns, (4) implausible or inconsistent explanations of behavior, (5) concealment of assets, (6) failure to cooperate with the tax authorities, (7) filing false Forms W-4, (8) failure to make estimated tax payments, (9) dealing in cash, (10) engaging in illegal activities, and (11) attempting to conceal illegal activity. Niedringhaus v. Commissioner, 99 T.C. 202, 211 (1992) (citing Bradford v. Commissioner, 796 F.2d 303, 307-308 (9th Cir. 1986), affg. T.C. Memo. 1984-601). The taxpayer's evasiveness on the stand, inconsistencies in his testimony, and the lack of credibility of such testimony are heavily weighted factors in considering the fraud issue. Toussaint v. Commissioner, supra at 312. The sophistication, education, and intelligence of the taxpayer are also relevant. Halle v. Commissioner, 175 F.2d 500, 503 (2d Cir. 1949); Niedringhaus v. Commissioner, supra. *270 Petitioner acknowledges that he was irresponsible and negligent in the manner in which he handled his business throughout all of the years in issue, but he contends that he did not intend to evade taxes known to be owing. We agree. Except for understatements of income for 1986 and 1987, resulting from an inadequate record-keeping system, we do not find any other badges of fraud. Petitioner indicated personal expenses from the business account as "owner's draw". All income was recorded in the cash receipt books or on clients' accounts receivable ledgers, and was easily ascertained by both the C.P.A. and the revenue agent. No records were hidden, falsified, or destroyed. They were available to Mr. Ruiz, but he lacked experience in preparing returns for law firms and failed to request them. We are aware that petitioner improperly commingled funds in his escrow account, and we do not wish to minimize the seriousness of this breach of legal ethics. See, e.g., Rule 1.15 of the Model Rules of Professional Conduct, which provides: "A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's *271 own property." However, as serious as it was, petitioner's violation of legal ethics in this regard appears to have been through laziness or inattention rather than an attempt to evade tax. [5]
In short, we believe the understatements of income were caused by a combination of petitioner's alcoholism, lax recordkeeping (especially with regard to his cash withdrawals and expenditures, many of which might have been deductible if petitioner had kept receipts), and the unsophisticated system set in place by one bookkeeper and continued by another. Petitioner provided everything requested by respondent, and he answered all respondent's questions truthfully to the best of his ability. We found petitioner to be a credible witness, whose testimony was substantiated by other credible witnesses. Respondent has simply not met her burden of proof. Negligence
Respondent determined *272 additions to tax for negligence under section 6653(a) for each of the years in issue. Negligence is a lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Rybak v. Commissioner, 91 T.C. 524, 565 (1988); Neely v. Commissioner, 85 T.C. 934, 947 (1985). Negligence includes any failure to make a reasonable attempt to comply with the provisions of the income tax laws. Sec. 6653(a)(3). Ordinarily, taxpayers bear the burden of proving that respondent's determination is erroneous. Rule 142(a); Axelrod v. Commissioner, 56 T.C. 248, 258-259 (1971). This is the rule where respondent raises the issue in the notice of deficiency, either by determination of a specific amount or as an alternative to fraud. However, where respondent raises new matter or an increased deficiency, respondent bears the burden of proof. Rule 142(a). In the notice of deficiency, respondent raised the issue of negligence for tax year 1985; thus the burden of proof is on petitioners. The situation for tax years 1986, 1987, and 1988, however, is more complex. *273 Section 6653(a)(2) provides that "There shall not be taken into account * * * any portion of an underpayment attributable to fraud". For 1986, respondent determined that $ 13,879 of the underpayment of $ 50,077 is attributable to negligence, and the balance to fraud. The negligence addition was thus determined at $ 694. For 1987, she determined $ 177 of an underpayment of $ 55,157 is attributable to negligence, and thus an addition of $ 9. For 1988, the notice of deficiency fails to explain how a negligence addition in the amount of $ 78 was determined; however, we can mathematically derive that if $ 78 represents 5 percent of the portion so attributable, that portion would be $ 1,560. Even when the portions of the underpayment attributed to negligence are indicated, there is no explanation of how these amounts were derived. That is, it is not clear which specific items of income or deductions respondent determined are merely negligent, as opposed to fraudulent. Section 6653(b)(2) provides: If the Secretary establishes that any portion of an underpayment is attributable to fraud, the entire underpayment shall be treated as attributable to fraud, except with respect to *274 any portion of the underpayment which the taxpayer established is not attributable to fraud.
Here, petitioners established that none of the underpayments are attributable to fraud. However, respondent did not alternatively determine that the nonfraudulent amounts are attributable to negligence. Petitioners argue that the Court is, therefore, precluded from considering the issue of negligence. We do not agree, because petitioner himself raised the issue several times during trial. We hold that the issue of negligence was tried by consent of the parties under Rule 41(b)(1). We hold further, however, that the burden of proof is on respondent as to any negligence additions greater than $ 694, $ 9, and $ 78 for 1986, 1987, and 1988, respectively. Pursuant to sections 6653(a)(1) for 1985, 6653(a)(1)(A) for 1986 and 1987, and 6653(a)(1) for 1988, if any part of an underpayment of tax is due to negligence or intentional disregard of rules or regulations (but without intent to defraud), the taxpayer is liable for an amount equal to 5 percent of the entire underpayment. Additionally, under sections 6653(a)(2) (applicable for 1985) and 6653(a)(1)(B) (for 1986 and 1987), there shall *275 be added to the tax an amount equal to 50 percent of the interest payable with respect to the portion of the underpayment attributable to the negligence. A taxpayer can avoid liability for the addition to tax for negligence if he can show that he reasonably relied on the advice of a competent and experienced accountant to prepare his return. Weis v. Commissioner, 94 T.C. 473, 487 (1990); Conlorez Corp. v. Commissioner, 51 T.C. 467, 475 (1968). The taxpayer must show that he supplied all necessary information to the accountant and that the error on the return resulted from the accountant's mistake. Pessin v. Commissioner, 59 T.C. 473, 489 (1972); Enoch v. Commissioner, 57 T.C. 781, 803 (1972); see Ma-Tran Corp. v. Commissioner, 70 T.C. 158, 173 (1978). Petitioner contends that the negligence addition should not be sustained, because he attempted to keep and preserve adequate records. He also contends he retained accounting personnel whom he, in good faith, believed possessed the necessary skills to maintain accurate books *276 and records. We disagree with petitioner, except as to 1985 and 1988. [6]
For tax years 1986 and 1987, petitioner admits he was in an alcoholic haze much of the time, did not keep records of the amount of cash withheld from the business, paid personal business expenses out of both the escrow account and the business account, and commingled funds in the clients' escrow account with his rental income, his mother's Social Security checks, and personal insurance proceeds. He did not tell Mr. Ruiz about the withheld cash. We find that the entire underpayments for 1986 and 1987 are due to negligence. For 1988, however, petitioner was not negligent. During the audit of his 1986 and 1987 years, petitioner hired a professional C.P.A. firm to prepare an accurate return for 1988. He provided the C.P.A. with all of his books and records, and he truthfully answered all questions. The errors attributable to the 1988 return were errors *277 of the accountant, not petitioner. The additions to tax for negligence for 1985 and 1988 are not sustained. Substantial Understatement
Section 6661(a) provides that if there is a substantial understatement of income tax for any taxable year, there shall be added to the tax an amount equal to 25 percent of the amount of any underpayment attributable to such understatement. A substantial understatement is an understatement that exceeds the greater of 10 percent of the tax required to be shown on the return for the taxable year, or $ 5,000. Sec. 6661(b)(1). The parties have agreed that there are understatements of $ 38,268, $ 17,071, and $ 7,345 for 1986, 1987, and 1988, respectively. Section 6661(c) provides that the Secretary may waive all or any part of the addition to tax on a showing by the taxpayer that there was reasonable cause for the understatement or that the taxpayer acted in good faith. Reliance on professional advice may constitute good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Sec. 1.6661-6(b), Income Tax Regs. We have held that this Court has the authority to review respondent's failure to *278 grant a waiver pursuant to section 6661(c). The appropriate standard of review is whether respondent has abused her discretion. Mailman v. Commissioner, 91 T.C. 1079, 1083 (1988). For the reasons set forth above in our discussion of negligence, we hold that petitioners are liable for the additions for 1986 and 1987. However, as to 1988, we hold that petitioners reasonably relied on the advice of Mr. Garcia in taking their return position and acted in good faith in taking that position. Accordingly, we conclude that respondent abused her discretion in refusing to waive the addition to tax under section 6661. See Cloud v. Commissioner, 97 T.C. 613 (1991). Therefore, petitioners are not liable for the addition as to 1988. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
*. 50 percent of the interest due on $ 3,250, $ 13,879, and $ 177 for tax years 1985, 1986, and 1987.↩
**. 50 percent of the interest due on $ 36,128 and $ 54,980 for tax years 1986 and 1987, respectively.↩
1. All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. Ms. Perkins was sent occasionally to make deposits.↩
3. On one occasion, petitioner also used the account to deposit loan proceeds. He also deposited an insurance reimbursement for his daughter's auto accident.↩
4. Respondent conceded approximately $ 102,000 in adjustments from the notice of deficiency. While the final deficiencies are stipulated, the record does not contain an item by item breakdown of the concessions.↩
5. There is no allegation that petitioner used clients' funds for his own benefit or that any client's funds were not returned to the client.↩
6. The deficiency in the 1985 year is related to a net operating loss carryback from 1988.↩